**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14

**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANGEL J. MENDEZ,

            Plaintiff,                                   No. C 03-4485 PJH

      v.                                                 **ORDER GRANTING DEFENDANT'S**
                                                         **MOTION FOR SUMMARY JUDGMENT**
COUNTY OF ALAMEDA, et al.,

            Defendants.

_____/

15   The motion of defendant Derek Meza for summary judgment came on for hearing

16   before this court on November 16, 2005.  Plaintiff appeared by his counsel Julie M. Houk, and

17   defendant appeared by his counsel Clyde A. Thompson.  Having read the parties' papers and

18   carefully considered their arguments and the relevant legal authority, and good cause

19   appearing, the court hereby GRANTS the motion as follows and for the reasons stated at the

20   hearing.

21                                              **INTRODUCTION**

22   This is an action brought under 42 U.S.C. § 1983.  Plaintiff Angel James Mendez

23   ("Mendez") alleges that defendants County of Alameda and Alameda County Sheriff's

24   Deputies Derek Meza ("Deputy Meza") and J. Russell ("Deputy Russell") violated his rights

25   under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

26   Mendez also asserts state law claims of negligence (against all defendants), battery

27   (against all defendants), violation of his rights under California Civil Code §§ 52 and 52.1

28   (against all defendants), and false arrest and imprisonment (against the County and Russell

United States District Court

For the Northern District of California

1  only).

2       Deputy Meza now seeks summary judgment on all claims asserted against him.

3                                    **BACKGROUND**

4       Mendez's allegations against Deputy Meza arise from an incident that occurred on

5  October 5, 2002.  On that date at approximately 12:55 a.m., Deputy Russell and another

6  Alameda County Sheriff's Deputy responded to a complaint from Nancy Arteaga ("Arteaga"),

7  who was Mendez's girlfriend at the time.  Arteaga complained that Mendez had arrived at her

8  house with a gun.

9       Deputy Russell prepared an incident report, and Arteaga signed a statement indicating

10  that Mendez had been violent and had assaulted her several times in the past while under the

11  influence of crystal methamphetamine, and that she was fearful for her own safety and the

12  safety of her family.  She stated that on October 5, 2002, Mendez had come to her house,

13  threatened her father with a gun, called her a "bitch," and pushed her into the bushes outside

14  of her house.  Arteaga, who was four months pregnant with Mendez's child at the time,

15  sustained injuries to her right knee, leg, and arm.  When she asked Mendez why he had

16  shoved her into the bushes, Mendez allegedly spit on her and said, "Shut up, bitch!"

17  According to Arteaga, Mendez then got into a car driven by his mother, and the car left the

18  scene.

19       Deputy Russell wrote up the report and took the statement from Arteaga.  He stated in

20  his report that two other officers went to Mendez's house, but no one answered.  According to

21  Deputy Russell, while he was at Arteaga's residence, she received three phone calls from

22  Mendez, who was calling her from his residence.  Arteaga told Mendez to stop calling her.  At

23  Deputy Russell's request, Arteaga called Mendez, but when Deputy Russell tried to talk to him,

24  Mendez hung up.  Deputy Russell called Mendez again from Arteaga's phone; Mendez

25  answered but then immediately hung up.

26       Later the same morning, Deputy Meza spoke briefly with Deputy Russell in the locker

27  room of the Sheriff's Office.  Deputy Russell was just ending his shift as Deputy Meza was

28  starting his.  Deputy Russell told Deputy Meza that if Meza got a "callback" to "the house on A

1   Street" (referring to Arteaga's house), there was probable cause to arrest Mendez on a

2   domestic violence charge.

3           Deputy Meza's supervisor, Sergeant Dan Murray ("Sgt. Murray"), also told Deputy

4   Meza that there was probable cause to arrest Mendez on a domestic violence charge. Sgt.

5   Murray told Deputy Meza to contact Mendez and arrest him. He told Deputy Meza to go to

6   Arteaga's home to look for Mendez if he could not contact Mendez at home.

7           Deputy Meza then went to Mendez's home with the intent of arresting him. He knocked

8   on the door to Mendez's apartment, and saw the vertical blinds open and close quickly, but

9   there was no response. He continued to knock on the door, but no one came out of the

10  apartment.

11          As instructed by Sgt. Murray, Deputy Meza next went to Arteaga's house, and asked

12  her whether she had seen Mendez. When Arteaga received a phone call from Mendez,

13  Deputy Meza asked her for the phone, and listened as Mendez shouted, "You fucking bitch,

14  why did you send the police to my house?!!" Deputy Meza then introduced himself to Mendez

15  on the phone, and asked Mendez why he had not answered the door earlier. Mendez

16  responded, "I don't give a fuck who you are. I don't have to do anything you say. You punk

17  motherfucker, I'll kick your fucking ass." Deputy Meza told Mendez he needed to talk to him

18  about the incident that had happened during the previous night. Mendez hung up the phone.

19          Deputy Meza obtained Mendez's telephone number from Arteaga and called him back.

20  Mendez did not pick up the phone, so Deputy Meza left a message on his answering machine.

21  On the message, Deputy Meza asked Mendez to pick up the phone, and indicated that he

22  would apprehend him if he saw him:

23          Angel, pick up the phone. As soon as you step out your door, I'm going to nab
            you. If you call over to her house again, make any threats, I'm going to kick your
24          door down and take you out, ok? You need to grow up, quit being a little baby.
            You got a problem, you call me directly, Deputy Meza. You step outside your
25          door, you better be ready 'cause I'm going to get you myself. Next time beat up
            on a guy instead of messing with a girl. Step outside and I'll be waiting for you.
26

27  Deputy Meza did not attempt to call Mendez again, did not leave any other messages for him,

28  and had no further contact with him. No arrest warrant was issued for Mendez, and he was

**United States District Court**
For the Northern District of California

1    never charged in connection with the October 5, 2005, incident.

2    On October 10, 2005, Barbara Overland ("Mrs. Overland"), a resident of Hayward who

3    did not know Mendez and had never previously seen him, found him sleeping on a lounge

4    chair in the garage of her home shortly before 8:00 p.m.  She noticed that he had a bruise on

5    his forehead.  Neither she nor her son Cory Overland was able to wake Mendez, and she

6    called Hayward police for assistance in removing him from her property.  The initial call for

7    service was put out on the police radio at 8:28 p.m.  Deputy Gemmell responded that he was

8    a few minutes away.

9    Before Deputy Gemmell arrived, however, Deputy Russell arrived on the scene in an

10   Alameda County Sheriff's Department vehicle.  Mrs. Overland told Deputy Russell she did not

11   necessarily want Mendez arrested, but just wanted him off her property.  Deputy Russell told

12   Mrs. Overland he would take care of it.  At 8:49 p.m., Deputy Russell radioed dispatch that he

13   had Mendez in custody.

14   While the officers were in the garage, Mrs. Overland (who could not see what was

15   going on in the garage) heard Mendez say, "Okay, okay, I'll quit struggling."  The officers then

16   walked out of the garage with Mendez, who was in handcuffs.  Deputy Gemmell arrived at

17   about that time.  He could not recall if Mendez seemed to be in any physical distress.  Mrs.

18   Overland recalled that Mendez was able to walk without any problem, and she saw no blood

19   on him.[1]  Deputy Russell and Deputy Gemmell walked Mendez to the patrol vehicle, and

20   Deputy Gemmell conducted a pat-down search.

21   After Mendez was placed in the police vehicle, one of the officers – Mrs. Overland

22   could not recall which one – told her that it was a good thing she had called them, as Mendez

23   was wanted for having beaten someone up.  Deputy Gemmell believed that Mendez was

24   going to be charged with public intoxication and resisting arrest.  That was the last interaction

25

26        [1] Cory Overland testified that when the police arrived at his mother's house, he went home,
     though a friend of his stayed with his mother.  After the police left, he went back to the garage, and
27   saw things "kind of turned over and messed up," and also noticed blood on the floor within a 15-
     foot radius of the couch where Mendez had been sleeping, "like somebody having a real bad
28   bloody nose."  He and his friend wiped up the blood with a towel.  He was certain the blood had
     not been there when they were trying to wake Mendez.

4

**United States District Court**
For the Northern District of California

1    Deputy Gemmell had with Mendez.

2         Deputy Gemmell returned to his shift, and Deputy Russell transported Mendez to Santa

3    Rita Jail.  Mendez testified that it took about 20 minutes to drive to Santa Rita from Mrs.

4    Overland's home.  He admitted that during that time, he was cursing Deputy Russell.  Deputy

5    Russell claimed that Mendez slipped out of his seatbelt during the ride, and attempted to kick

6    out the window of the patrol vehicle.

7         According to Mendez, after they arrived at Santa Rita and he was removed from the

8    patrol vehicle, he began walking toward the door of the jail.  At that point, he asserts, Deputy

9    Russell grabbed him from the back of his head and slammed his face into the wall of the

10   building, chipping his tooth, and then began beating him.  Mendez claims that some of the

11   blows were to the stomach area, and that he collapsed and fell to the sidewalk.

12        Deputy Russell denies that he assaulted Mendez when they arrived at Santa Rita.  He

13   maintains that after he pulled Mendez (whom he claims was still kicking) out of the patrol

14   vehicle, he placed Mendez in a holding cell at the jail.  After removing the handcuffs, he

15   noticed that Mendez had vomited and was drooling on himself.  He attempted to find a jail

16   nurse to obtain clearance for Mendez to be booked into the jail.

17        According to deposition testimony of Irene Favila, the nurse at Santa Rita who

18   responded to the request, the arresting agency will not bring an arrestee to the jail if he is in

19   acute distress, but will generally automatically take him to the hospital to get a clearance

20   before transporting him to the jail.  She also testified, however, that when an inmate or

21   arrestee is extremely drunk, or belligerent or agitated, the officer will bring him straight to a

22   holding tank, and a nurse has to clear the inmate/arrestee to determine if he can be safely

23   held in custody there, before he can be fingerprinted and booked.

24        When Nurse Favila arrived at the holding tank, a number of deputies were standing

25   inside.  She noticed that Mendez was lying on his side on the concrete bench.  She asked him

26   to sit up so she could evaluate him, and a deputy attempted to pull him up into a seated

27   position, but Mendez kept slumping back down.  She had the impression that Mendez could

28   not sit up on his own.  She thought at first that he was intoxicated, because she noticed the

United States District Court

For the Northern District of California

1   smell of alcohol.  She believed he was conscious because every time she asked him a

2   question – e.g., "Are you sick?"  "Are you on any medication?"  "Are you injured?"  "Can you

3   talk to me?" – he would moan.  She observed that his eyes were crossed and he had some

4   contusions on his face.  Because she could not get answers to her questions and because

5   she was concerned that the crossed eyes might indicate some neurological condition, she

6   stated that she would not clear Mendez, that Mendez would have to be taken to the hospital to

7   be cleared.

8       After Nurse Favila said she would not clear Mendez, she became aware that Mendez

9   was Deputy Russell's arrestee.  She claims that Russell became upset and yelled at her,

10  saying that her decision was "BS," and that he wanted another nurse to clear Mendez, to get a

11  second opinion.  Favila told Deputy Russell that there was another nurse he could talk to.

12      Nurse Ella Garrido was in the office, but she indicated to Nurse Favila that she did not

13  want to go see Mendez, because she did not want to override Favila's decision.  Deputy

14  Russell told Favila that he was familiar with Mendez, that Mendez had been at Santa Rita on

15  many occasions and that his eyes were always crossed, and that he was simply intoxicated.

16  However, Favila still refused to clear him.

17      Nurse Favila asked Deputy Russell if Mendez had been involved in a car accident or a

18  fight, because she wondered why he had contusions on his face, and Russell said that he had

19  received a call from an old lady saying there was a drunk guy sleeping in her garage, and that

20  when Russell arrived, Mendez looked as he did when he arrived in the holding tank.

21      Deputy Russell testified that he then attempted to locate a sergeant to override Nurse

22  Favila's decision, because he believed that Mendez was merely drunk, and that Favila had not

23  conducted an adequate assessment because she simply stood at the doorway to the holding

24  tank while she made her decision, rather than going inside to see Mendez.  Deputy Russell

25  spent five or ten minutes looking for the sergeant – Sgt. Rosales – but Rosales said she would

26  stand by the nurse's decision.

27      At that point, Deputy Russell decided to take Mendez to the hospital.  He removed

28  Mendez from the holding tank, walked him to another cell closer to the exit, and waited for two

United States District Court

For the Northern District of California

1  other deputies to arrive so they could follow Deputy Russell to the hospital in case Mendez

2  tried to kick out the window again.

3      When Deputy Russell returned to the cell, he found Mendez lying on the floor in a

4  spread-eagle position.  He noticed that Mendez was sweating quite a bit.  He told Mendez to

5  sit up, but Mendez did not respond.  Deputy Russell cuffed him, and more or less carried him

6  to the patrol vehicle.  Deputy Russell then drove Mendez to the hospital, and the other deputies

7  followed.  Mendez was admitted to Valley Care Medical Center in Pleasanton a few minutes

8  before 11:00 p.m.

9      Mendez was assessed at Valley Care, and was determined to be in critical condition.

10  The doctor who treated him, Dr. Howard Yoshioka, testified that Deputy Russell stated that

11  Mendez had been injured earlier in the day in an altercation while intoxicated, and that Mendez

12  had been tackled to the ground during his arrest.

13     Mendez was then transported by ambulance to Eden Hospital in Castro Valley, for

14  emergency surgery.  The doctor who treated him at Eden Hospital, Dr. Kristen Engle, asked

15  Mendez what had happened, and testified that he told her he had been beaten by the police.

16  Dr. Engle also testified that Mendez was "near extremis" when he was admitted – his blood

17  pressure was almost non-existent, and he had lost a lot of blood.  She performed emergency

18  surgery, and determined that Mendez's liver was crushed and his severe blood loss was

19  caused by the liver damage.  According to Dr. Engle, the injury that caused the damage to

20  Mendez's liver occurred within an hour of his admission to Valley Care, and was consistent

21  with either one blow or multiple blows of a deep and narrow nature to the abdomen.

22     Mendez claims that following this incident, an unidentified Alameda County Sheriff's

23  Deputy visited Cory Overland, and suggested to him that he should forget anything he might

24  know about the incident on the Overland property.  According to Cory Overland, he had an

25  outstanding warrant for a seatbelt violation, and was afraid that if he talked to anyone about

26  the incident he might be arrested.

27     Mendez also asserts that after he filed this lawsuit, Deputy Russell retaliated against

28  him on February 13, 2004, claiming that Mendez was violating a domestic violence restraining

order obtained by Arteaga, even though Arteaga (who by this time had become Mrs. Mendez) had told Deputy Russell that there was no violation of the restraining order because the order had been modified.

Finally, Mendez claims that on another occasion, Alameda County Deputy Sheriff Frank Cessna, with whom Deputy Russell has socialized outside of work, responded to a subsequent incident involving Arteaga that had nothing to do with Mendez.  Arteaga testified that Deputy Cessna told her that Mendez was "no good" and that she should leave him, and that if she saw him again, she should tell him that Cessna was going to beat him up worse than Deputy Russell did.  (Deputy Cessna denied saying this.)

Mendez filed this action on October 3, 2003, and filed a first amended complaint on January 24, 2005.  Mendez alleges that Deputy Meza threatened Mendez when he left the message on Mendez's answering machine, and that Deputy Russell and Deputy Meza later agreed to violate Mendez's constitutional rights.  Mendez asserts that Deputy Russell and Deputy Meza acted pursuant to this conspiracy when they committed the constitutional violations as well as when they engaged in the acts alleged in the state law claims.

**DISCUSSION**

A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial,

1   the moving party can prevail merely by pointing out to the district court that there is an absence

2   of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial

3   burden, the opposing party must then set forth specific facts showing that there is some

4   genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P. 56(e); Anderson, 477

5   U.S. at 250.

6          "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some

7   significant probative evidence tending to support the complaint."  Smolen v. Deloitte, Haskins

8   & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must view the

9   evidence in the light most favorable to the non-moving party.  United States v. City of Tacoma,

10  332 F.3d 574, 578 (9th Cir. 2003).  The court must not weigh the evidence or determine the

11  truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v.

12  Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  If the nonmoving party fails to show that

13  there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."

14  Celotex, 477 U.S. at 323.  Regardless of whether plaintiff or defendant is the moving party,

15  each party must "establish the existence of the elements essential to [its] case, and on which

16  [it] will bear the burden of proof at trial."  Id. at 322.

17  B.      Defendant's Motion

18         Deputy Meza argues that summary judgment should be granted on the constitutional

19  claims because Mendez cannot establish a constitutional violation by Deputy Meza under 42

20  U.S.C. § 1983; because Deputy Meza is entitled to qualified immunity; and because there is

21  no evidence to support the existence of a conspiracy under § 1983.

22         With regard to the state law claims, Deputy Meza contends that Mendez's state law

23  claims are barred by governmental immunities; that the claim under Civil Code § 52 cannot

24  stand because Mendez cannot prove that Deputy Meza intended to discriminate against him

25  on the basis of race, nationality, or gender; that the claim under Civil Code § 52.1 fails

26  because Mendez cannot prove that Deputy Meza interfered with a constitutional or legal right

27  and cannot prove that he actually feared Deputy Meza's voicemail message; that the

28  negligence claim is without merit because Mendez cannot prove that Deputy Meza's behavior

United States District Court
For the Northern District of California

9

**United States District Court**
For the Northern District of California

1   caused his injuries and there is no evidence that Deputy Meza engaged in a conspiracy to

2   harm Mendez; and that the battery claim fails because Mendez cannot prove that Deputy

3   Meza ever had any physical contact with Mendez and there is no evidence that Deputy Meza

4   participated in a conspiracy to harm Mendez.

5        1.     Federal constitutional claims

6        Deputy Meza alleges numerous constitutional claims under 42 U.S.C. § 1983.  Section

7   1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities

8   secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp. Ass'n,

9   496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983).  Section 1983 is not itself a source of

10  substantive rights, but merely provides a method for vindicating federal rights elsewhere

11  conferred.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989).  To state a claim under §

12  1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution

13  or laws of the United States was violated and (2) that the alleged violation was committed by a

14  person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988);

15  Ketchum v. Alameda County, 811 F.2d 1243, 1245 (9th Cir. 1987).

16       Mendez alleges that defendants violated his First, Fourth, and Fourteenth Amendment

17  rights.  He does not specify which particular constitutional claims are directed toward conduct

18  by Deputy Meza.  At the hearing, counsel clarified that Mendez is asserting that Deputy Meza

19  violated his Fourth Amendment rights to be free from the use of excessive force and free from

20  unlawful search and seizure, and his Fourteenth Amendment due process right not to be

21  deprived of proper medical treatment while in pretrial custody, and that he is not asserting

22  claims against Deputy Meza under the First Amendment.

23       In his moving papers, Deputy Meza notes Mendez's various constitutional claims, and

24  argues that there is no evidence to support any of them.  Deputy Meza asserts that the only

25  two incidents involving him are the allegedly threatening voicemail, and the alleged conspiracy

26  with Deputy Russell to violate Mendez's constitutional rights.  He contends that mere verbal

27  threats are not sufficient to constitute constitutional violations, and that there is no evidence of

28  a conspiracy between Deputy Meza and Deputy Russell to violate Mendez's constitutional

United States District Court

For the Northern District of California

1    rights.

2         In his opposition, Mendez focuses on the Fourth Amendment claim.  He implicitly

3    acknowledges that he has no direct claim for excessive force against Deputy Meza.  He

4    concedes that he is not claiming that the verbal threat alone violated his constitutional rights,

5    but contends that there are disputed material facts and "credibility issues" that preclude

6    summary judgment on the question whether Deputy Meza conspired together with Deputy

7    Russell to violate Mendez's Fourth Amendment rights.

8         In order to avoid summary judgment on a claim of conspiracy to violate constitutional

9    rights under § 1983, "the plaintiff must state specific facts to support the existence of the

10    claimed conspiracy."  Burns v. County of King, 883 F.2d 819, 821 (9th Cir. 1989).  Mendez

11    asserts that the following facts establish the existence of a conspiracy between Deputy Meza

12    and Deputy Russell – 1) on October 5, 2002, Deputy Russell told Deputy Meza in passing in

13    the locker room of the Sheriffs' Department that probable cause existed to arrest Mendez for

14    domestic violence; 2) Deputy Meza and Deputy Russell did not discuss any other cases

15    during their brief conversation in the locker room; 3) Deputy Meza went to Mendez's home to

16    investigate that same day; 4) Deputy Meza did not try to obtain an arrest warrant on that day;

17    5) Deputy Meza left a threatening message on Mendez's answering machine that same day;

18    and 6) Deputy Russell allegedly beat Mendez up after apprehending him in the course of

19    responding to a trespassing call on October 10, 2002.

20         Mendez contends that the actions taken by Deputy Meza, combined with the allegation

21    (not established) that Deputy Russell beat him up in the course of arresting him, establish that

22    a conspiracy existed between Deputy Meza and Deputy Russell to violate his Fourth

23    Amendment rights.

24         Deputy Meza argues that the facts listed by Mendez are insufficient to establish that he

25    is liable for Mendez's alleged injuries, because there is no causal or logical conclusion

26    between the conduct described in Nos. 1-5, above, and the occurrence described in No. 6.

27    He also contends that there is no evidence that he and Deputy Russell had a "meeting of the

28    minds" with regard to injuring Mendez, or that he and Deputy Russell worked closely together

to investigate or arrest Mendez on any continuing basis, or that they had several meetings or discussions about Mendez, or that they had any agreement to violate Mendez's constitutional rights.

Moreover, Deputy Meza asserts that he could not possibly have known on October 5th, when he spoke to Deputy Russell in the locker room, that Deputy Russell would be called to Mrs. Overland's home to roust Mendez out of the garage on October 10th, let alone conspire with Deputy Russell to injure Mendez on that date.

Deputy Meza argues that in the absence of a conspiracy to violate Mendez's constitutional rights, the claim amounts to nothing more than allegations of a verbal threat (the message left on Mendez's answering machine), which does not rise to the level of a Fourth Amendment violation because Deputy Meza did not inflict any force or violence on Mendez.

Deputy Meza also contends that even if the court finds a triable issue with regard to the alleged constitutional violations, he should be entitled to qualified immunity.  Specifically, Deputy Meza asserts that a reasonable officer would believe that it is lawful to make a mere verbal threat, in the absence of any physical violence, during an attempt to arrest someone.

Mendez responds Deputy Meza is not entitled to qualified immunity, because at the time of the incidents alleged in the complaint, the law was clearly established that a conspiracy by law enforcement officers to violate the rights of a citizen by subjecting him to excessive force violated the Fourth Amendment.  He argues that no reasonable officer could have believed that participation in such a conspiracy was lawful.

The court finds that the motion must be GRANTED.  There is no evidence that Deputy Meza violated Mendez's constitutional rights or that he conspired with Deputy Russell or anyone else to violate Mendez's constitutional rights.

Mendez asserts that Deputy Meza conspired with Deputy Russell to violate Mendez's right to be free from excessive force and unlawful search and seizure.  The constitutional right at issue is the Fourth Amendment right to be "secure . . . against unreasonable . . . seizures." U.S. Const. amend. IV.  A free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, an investigatory stop, or other "seizure" of his person"

12

United States District Court

For the Northern District of California

1    is properly analyzed under the Fourth Amendment's "objective reasonableness" standard.

2    <u>Graham</u>, 490 U.S. at 394-95.

3         In this case, however, there is no evidence that Deputy Meza used excessive force on

4    Mendez, as it is undisputed that there was no physical or even face-to-face contact between

5    the two of them.  Thus, the only claim Mendez can assert against Deputy Meza is the claim that

6    Deputy Meza and Deputy Russell conspired to violate his Fourth Amendment rights.

7         To establish Deputy Meza's liability for a conspiracy, Mendez must "demonstrate the

8    existence of an agreement or meeting of the minds to violate constitutional rights."  <u>Mendocino</u>

9    <u>Environmental Ctr. v. Mendocino County</u>, 192 F.3d 1283, 1301 (9th Cir. 1999) (citations and

10   quotations omitted).  Deputies Meza and Russell must have, "by some concerted action,

11   intended to accomplish some unlawful objective for the purpose of harming another which

12   results in damage."  <u>Id.</u> (citations and quotations omitted).  The agreement need not be overt,

13   and may be based on circumstantial evidence.[2]  So long as there is a possibility that a jury

14   can infer from the circumstances that Deputies Meza and Russell had a "meeting of the minds"

15   and reached an understanding to further the objectives of the conspiracy, the question whether

16   they were involved in an unlawful conspiracy to violate Mendez's constitutional rights should be

17   resolved by a jury.  <u>Id.</u>

18        Here, however, there is no evidence – even circumstantial evidence – of a conspiracy

19   between Deputy Meza and Deputy Russell.  The facts cited by Mendez do not provide

20   circumstantial evidence of a "meeting of the minds," and there is nothing from which a jury

21   could infer that Deputy Meza and Deputy Russell intended to accomplish some concerted

22   action with the purpose of injuring Mendez.  Because Mendez has failed to state specific facts

23   supporting the existence of the claimed conspiracy, <u>Burns</u>, 883 F.2d at 821, the motion for

24   summary judgment on the § 1983 claims must be GRANTED.

25        Because the court finds that there is no constitutional violation, it is unnecessary to

26   _____

27        [2]  Because direct evidence of improper motive or an agreement among the parties to
     violate a plaintiff's constitutional rights will only rarely be available, "it will almost always be
28   necessary to infer such agreements from circumstantial evidence or the existence of joint action."
     <u>Id.</u> at 1302.

United States District Court

For the Northern District of California

1  reach the question of qualified immunity.  See Saucier v. Katz, 533 U.S. 194, 201 (2001)

2  (district court must first determine, based on facts taken in light most favorable to party

3  asserting injury, whether  officer's alleged conduct violates a constitutional right; if no

4  constitutional violation can be established on facts alleged, there is no necessity for further

5  inquiries concerning qualified immunity).

6         2.     State law claims

7                a.     claims under Civil Code § 52 and § 52.1

8         Mendez asserts claims under California Civil Code § 52 and 52.1 against all

9  defendants.  The claim against Deputy Meza is based on the allegation that he left a

10 threatening, intimidating voicemail on Mendez's answering machine on October 5, 2002.

11 Deputy Meza acknowledges that he left the message, but asserts that he did it in the context of

12 trying to apprehend Mendez for committing domestic violence, and also contends that there

13 was probable cause to arrest Mendez for domestic violence.  He argues that he is entitled to

14 summary judgment on these claims.

15        California Civil Code § 51 provides that all persons within the jurisdiction of California

16 have the right to be free from violence, or intimidation by threats of violence, committed

17 against their persons or property because of their race, color, religion, ancestry, national

18 origin, political affiliation, sex, sexual orientation, disability, or position in a labor dispute, or

19 because another person perceives them to have these characteristics.  Cal. Civ. Code §

20 51(b).  California Civil Code § 52 provides that anyone who discriminates on the basis of the

21 characteristics listed in § 51, or denies any right listed in § 51, will be liable for damages to

22 the aggrieved person.  Cal. Civ. Code § 52(a).

23        Deputy Meza argues that summary judgment must be granted on the § 52 claim

24 because there is no evidence that the phone message was motivated by animus based on

25 Mendez's gender, race, national origin, or any other characteristic referred to in § 51.  He

26 contends that there is no evidence that he left the message based on any intent to

27 discriminate for any reason, but rather that the purpose was to convey that he intended to

28 arrest Mendez for his violent conduct toward Arteaga.

United States District Court

For the Northern District of California

1      In opposition, Mendez asserts that the sole relevance of § 52 to this case is as the

2  "damage component" to the liability set forth in § 52.1.  (Section 52.1(b) provides that a

3  person aggrieved by the violation of their rights under § 52.1 may be entitled to damages,

4  which include but are not limited to, those enumerated in § 52.)  Mendez maintains that

5  notwithstanding that he has no claim under § 52, summary judgment should not be granted

6  because he is entitled to the measure of damages set forth in § 52.

7      California Civil Code § 52.1 provides that anyone whose exercise or enjoyment of

8  rights secured by the Constitution of laws of the U.S. "has been interfered with or attempted to

9  be interfered with" by any person who engages in "threats, intimidation, or coercion, or

10  attempts to interfere by threats, intimidation, or coercion" may file a civil action for damages.

11  Cal. Civil Code § 52.1(a), (b).

12      Section 52.1 requires an attempted or completed act of interference with a legal right,

13  accompanied by a form of coercion.  Jones v. Kmart Corp., 17 Cal. 4th 329, 331-34 (1998).

14  Speech alone is not sufficient to support an action brought pursuant to § 52.1(a) or (b), except

15  upon a showing that the speech itself threatens violence against a specific person or group of

16  persons; the person or group of persons against whom the threat is reasonably directed fears

17  that, because of the speech, violence will be committed against them or their property; and

18  that the person threatening violence has the apparent ability to carry out the threat.  Cal. Civ.

19  Code § 52.1(j).  Section 52.1 does not require a showing that the defendant acted with

20  discriminatory animus or intent.  Venegas v. County of Los Angeles, 32 Cal. 4th 820, 842-50

21  (2004).

22      Deputy Meza argues that summary judgment must be granted on this claim because

23  his conduct toward Mendez ("a mere verbal threat") involved no violation of Mendez's

24  constitutional rights, and because Mendez has provided no evidence that Deputy Meza

25  interfered with his constitutional rights or with any other legal right.

26      Deputy Meza also contends that this claim must be dismissed because Mendez cannot

27  demonstrate that the voicemail message made him fearful that Deputy Meza would commit

28  violence against him.  Mendez testified in his deposition that he could not recall the substance

15

United States District Court

For the Northern District of California

of the message.  His mother, Deborah Mendez, testified in her deposition that she never attempted to contact the Alameda County Sheriff's Office to complain about the voicemail message, and that she did not believe that Mendez himself ever filed a complaint with the Sheriff's Office regarding the message.  Deputy Meza contends that the fact that Mendez could not even remember the substance of the message and the fact that neither he nor his mother filed any sort of complaint about it indicates that Mendez had no real fear of Deputy Meza's words.

In opposition, Mendez argues that he is not claiming that Deputy Meza's speech alone was the cause of the violation of his constitutional rights.  He claims that the voicemail message constitutes "circumstantial evidence" of the conspiracy to violate his constitutional rights.

The court finds that the motion must be GRANTED.  In arguing that Civil Code § 52 provides the "damage component" for the claim under § 52.1, while simultaneously failing to provide any evidence of any discriminatory action taken against him, Mendez essentially concedes that he has no claim under § 52.

With regard to the claim under § 52.1, to the extent that Mendez alleges a violation of his constitutional rights, the claim must be dismissed because Mendez has not asserted any constitutional claim under § 52.1 that is distinct from the claims under § 1983.

Section 52.1 provides a cause of action for persons prevented from exercising constitutional or statutory rights.  Mendez has not provided evidence showing "an attempted or completed act of interference with a legal right, accompanied by a form of coercion."  See Jones, 17 Cal. 4th at 334.  To the extent that Mendez alleges solely a verbal threat, without an act or an attempted act of interference with legal rights, he does not argue, and provides no evidence – i.e., no declaration, no deposition testimony – showing that he reasonably feared that, because of the verbal threat, violence would be committed against him or his property.

Moreover, the alleged "threat" is not actionable under § 52.1, even had Mendez established that he reasonably feared that violence would be committed against him.  Deputy Meza made two "threats" in the phone message – the threat to arrest Mendez as soon as

16

United States District Court

For the Northern District of California

1  Mendez stepped out his door, and the threat to "kick your door down and take you out" if

2  Mendez made any more threats to Arteaga.  Deputy Meza had probable cause to arrest

3  Mendez, and so the "threat" to arrest him cannot be unlawful.  The "threat" to "take you out" was

4  conditional or hypothetical – if Mendez threatened Arteaga again, then Deputy Meza would

5  use violence against Mendez.  This is not an actual, present, "threat."

6              b.    negligence claim

7        Mendez alleges a claim of negligence against all defendants, asserting that the

8  defendants, individually and/or while acting in concert with one another, owed him a duty to

9  exercise reasonable care to avoid injury during the alleged incident, and that they negligently

10  breached such duty of care, resulting in his injuries.

11        To establish a claim of negligence, a plaintiff must show that the defendant had a duty

12  to use due care, that the defendant breached that duty, and that the breach was the proximate

13  or legal cause of the resulting injury.  Munoz v. City of Union City, 120 Cal. App. 4th 1077,

14  1093 (2004).  To demonstrate causation, the plaintiff must show that the defendant's act or

15  omission was a "substantial factor" in bringing about the injury.  Castaneda v. Olsher, 132 Cal.

16  App. 4th 627, 643 (2005).  Because Mendez alleges that defendants conspired together to

17  commit negligence, he must also prove the existence of a conspiracy.

18        Deputy Meza argues that summary judgment must be granted on the negligence claim

19  because there is no evidence that he committed any act or omitted to do anything that caused

20  Mendez's injuries.  Deputy Meza also asserts that summary judgment should be granted on

21  this claim because there is no evidence of any conspiracy or meeting of the minds between

22  himself and Deputy Russell.

23        In opposition, Mendez argues that the evidence and inferences viewed in the light most

24  favorable to him as the non-moving party support the conclusion that Deputy Meza engaged in

25  a civil conspiracy to physically harm him and that Deputy Russell committed an overt act

26  (beating Mendez) to further the goals of the conspiracy.

27        The court finds that the motion must be GRANTED.  Mendez provides no evidence that

28  Deputy Meza committed any act or omitted to do anything that caused Mendez's injuries.

**United States District Court**

For the Northern District of California

1   Moreover, the law does not recognize a conspiracy to commit negligence.  A conspiracy by

2   definition requires intentional agreement to commit or achieve a specific outcome.  Choate v.

3   County of Orange, 86 Cal. App. 4th 312, 333 (2000).  Conspiracy requires an intentional act,

4   though it is not a separate tort but rather a means of affixing liability on all persons who have

5   agreed to a common design to commit a wrong.  Id.

6           It is a non sequitur to speak of parties intentionally agreeing to fail to exercise due care.

7   See Koehler v. Pulvers, 606 F.Supp. 164, 173 n.10 (S.D. Cal. 1985) (law does not impose

8   liability for conspiring to commit negligence because act of conspiracy requires two or more

9   persons agreeing to commit intentionally wrongful act); see also Sonnenreich v. Philip Morris

10  Inc., 929 F.Supp. 416, 419-420 (S.D. Fla. 1996) (impossible to conspire to act negligently);

11  Rogers v. Furlow, 699 F.Supp. 672, 675 (N.D. Ill. 1988) (claim of conspiracy to commit

12  negligence is "paradox").

13                   c.      battery claim

14          Mendez alleges a claim of battery against all defendants, asserting that the defendants,

15  acting together pursuant to a conspiracy, caused him to be subjected to a non-consensual,

16  non-privileged, offensive touching of his body.

17          A battery is "any intentional, unlawful and harmful contact by one person with the person

18  of another . . . .  a 'contact' is 'unlawful' if it is unconsented to."  Piedra v. Dugan, 123 Cal. App.

19  4th 1483, 1495 (2004) (citation omitted).  When a battery claim is brought against a police

20  officer, the plaintiff has the burden of showing unreasonable force as an element of the claim.

21  Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1272-74 (1998).

22          Deputy Meza argues that summary judgment must be granted as to this claim because

23  there is no evidence that he ever had any physical contact with Mendez.  The evidence shows

24  that on October 5, 2002, Deputy Meza was never able to interact with Mendez in person, and

25  that he had no further contact with Mendez.  Deputy Meza also asserts that there is no

26  evidence that he conspired with Deputy Russell or anyone else to harm Mendez.

27          In opposition, Mendez argues (as with the negligence claim) that the evidence and

28  inferences viewed in the light most favorable to him as the non-moving party support the

18

United States District Court

For the Northern District of California

1  conclusion that Deputy Meza engaged in a civil conspiracy to physically harm him and that

2  Deputy Russell committed an overt act (beating Mendez) to further the goals of the conspiracy.

3      The court finds that the motion must be GRANTED.  There is no evidence that Deputy

4  Meza committed a battery on Mendez, and the conspiracy claim is unsupported by any

5  evidence, as stated above.

6               d.      governmental immunities

7      Deputy Meza also argues that the state law claims are barred by the immunities

8  contained in California Government Code §§ 820.2, 820.4, and 820.8.  Because summary

9  judgment must be granted on the state law claims, the court does not address the arguments

10 regarding the governmental immunities.

11     3.      Plaintiff's objections to evidence and motion to strike

12     With his opposition to the motion for summary judgment, Mendez filed objections to

13 some of the evidence submitted by Deputy Meza.  In the reply, Deputy Meza argues that this

14 additional submission violates the local rules of this court, because it (8 pages) added to the

15 opposition brief (25 pages) equals 33 pages, and Mendez did not obtain leave of court to file

16 an oversize brief.  See Civ. L.R. 7-4(b) (opposition brief not to exceed 25 pages).  Meza also

17 asserts that he should not have to respond to these objections in his reply brief, and should be

18 given the opportunity to frame an adequate response.

19     While it is true that a brief filed in support of a motion or the opposition to a motion

20 should not exceed 25 pages without leave of court, the court does routinely consider

21 objections to evidence filed in separate documents.  Moreover, it does not appear that Deputy

22 Meza was prejudiced by using part of his reply brief to respond to the objections, as he used

23 only 11 of the 15 pages to which he was entitled under the local rules.

24     With regard to the specific objections, the court rules as follows:

25              a.      Mendez moves to strike the Declaration of Deputy Jon Rudolph, in which

26 the declarant provides information regarding Mendez's criminal history.  Mendez argues that

27 this evidence is not relevant to the subject of the present motion, that Deputy Rudolph has no

28 personal knowledge of the information in the criminal history report, that the evidence

**United States District Court**

For the Northern District of California

1   constitutes character evidence that is highly prejudicial and is not admissible under Federal

2   Rule of Evidence 404(a), and that evidence of uncharged crimes is not admissible.

3        Deputy Meza responds that the Rudolph Declaration was offered for the sole purpose

4   of authenticating the attached business records of the Alameda County Sheriff's Office.  He

5   contends that the number and frequency of Mendez's prior encounters with the police are

6   relevant to disprove that the events alleged in the complaint were not the result of a conspiracy

7   to violate his civil rights.  He also asserts that the criminal history records are not offered as

8   character evidence.

9        The court did not consider this evidence in ruling on the motion for summary judgment.

10  The objection is OVERRULED.

11        b.      Mendez objects to ¶ 2 of the Declaration of Deputy Derek Meza, arguing

12  that it consists of a report of out-of-court statements made to him by Sgt. Murray, offered for

13  the truth of the matter asserted, and therefore constitutes inadmissible hearsay.

14        In ¶ 2 of his declaration, Deputy Meza states that Sgt. Murray told him there was

15  probable cause to arrest Mendez, and asked him to contact Mendez and arrest him, and to go

16  to Arteaga's house if he could not locate Mendez.  Deputy Meza contends that these hearsay

17  statements are admissible under the state-of-mind exception to the hearsay rule, as set forth

18  in Federal Rule of Evidence 803(3).

19        This objection is OVERRULED.  An out-of-court statement is hearsay only if it is

20  offered for its truth.  Fed. R. Evid. 801(c).  The statements offered by Deputy Meza do not

21  assert facts.  They are orders or instructions, which by their nature are neither "true" nor "false,"

22  and thus cannot be offered to prove the truth of something asserted.  See United States v.

23  Shepherd, 739 F.2d 510, 514 (10th Cir. 1984); United States v. Keane, 522 F.2d 534, 558

24  (7th Cir. 1975), overruled on other grounds by McNally v. United States, 483 U.S. 350 (1987).

25        Moreover, to the extent that the statements may have been offered as circumstantial

26  evidence of Deputy Meza's belief that there was probable cause to arrest Mendez, they are

27  admissible under the "state of mind" exception.  Under Federal Rule of Evidence 803(3),

28  courts admit "[a] statement of the declarant's then existing state of mind, emotion, sensation,

United States District Court

For the Northern District of California

1  or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily

2  health), but not including a statement of memory or belief to prove the fact remembered or

3  believed." The statement by Sgt. Murray falls within this exception – to show Deputy Meza's

4  belief that there was probable cause to arrest Mendez.

5          c.    Mendez objects to what he terms the mischaracterization of his

6  deposition testimony, referring to testimony that Deputy Meza had done nothing to cause his

7  injuries. Mendez claims that it is obvious from the testimony that defendant's counsel was

8  asking him whether he was contending that Deputy Meza had caused him injuries related to

9  this lawsuit on other occasions when Mendez had had actual contact with Deputy Meza.

10      Deputy Meza does not respond to this objection. The objection is OVERRULED. The

11  court finds both the question and the response to be somewhat ambiguous, and consequently

12  did not rely on this evidence in ruling on the motion. Moreover, Mendez's testimony is not

13  essential to a finding that Deputy Meza had no physical contact with Mendez, as Mendez

14  concedes that fact in his opposition to the motion.

15          d.    Mendez objects to the inclusion of a reference in his deposition testimony

16  to prior contacts with the Hayward Police Department, for the same reasons that he objects to

17  the criminal history information in the Rudolph Declaration. Deputy Meza contends that this

18  objection should be overruled for the same reason as the objection to the Rudolph

19  Declaration. This objection is OVERRULED. The court did not consider this evidence in

20  ruling on the motion.

21          e.    Mendez objects to the admission of what he claims are hearsay

22  statements in the Alameda County Sheriff's Office report prepared by Deputy Russell on

23  October 5, 2002.

24      Deputy Meza contends that this objection should be overruled because Mendez has

25  not identified the specific statements that he contends are hearsay. Deputy Meza also asserts

26  that the statements in the report are admissible under the present sense impression

27  exception, state-of-mind exception, business records exception, and public records exception

28  to the hearsay rule.

United States District Court

For the Northern District of California

1      The business records exception to the hearsay rule, <u>see</u> Fed. R. Evid. 803(6),  applies

2 to records kept in the course of a regularly conducted business activity.  Police reports are not

3 considered "business records."  They fall in the category of "public records and reports."  The

4 public records exception to the hearsay rule, <u>see</u> Fed. R. Evid. 803(8), applies to records and

5 statements of public agencies, setting forth "matters observed pursuant to duty imposed by

6 law as to which matters there was a duty to report," but does <u>not</u> include "in criminal cases

7 matters observed by police officers and other law enforcement personnel."  However, the

8 public records exception <u>does</u> apply in civil actions, with regard to "factual findings resulting

9 from an investigation made pursuant to authority grated by law, unless the sources of

10 information or other circumstances indicate lack of trustworthiness."

11      The question whether one can use a police report as evidence depends in part on what

12 it is being offered to prove.  Here, Deputy Meza cites to the report three times in the

13 introductory section of the brief that describes the events of October 5, 2002 – to support the

14 statement that Deputies Russell and Felix responded to a complaint from Arteaga on October

15 5, 2002, at 12:55 a.m.; to support the statement that Arteaga complained that Mendez arrived

16 at her house with a gun and committed domestic violence; and to support the statement that

17 Deputy Russell prepared an incident report for the domestic violence incident.  None of these

18 facts is an essential part of Deputy Meza's argument – that he used no unlawful force on

19 Mendez, and that he did not enter into a conspiracy with Russell to violate Mendez's

20 constitutional rights.  Rather, the report is simply used to provide background information.

21      With regard to the objection, however, the court finds that it must be OVERRULED,

22 because Mendez has not identified which specific statements are hearsay.

23      f.    Mendez objects to the admission of the excerpts from the deposition of

24 Nancy Arteaga on grounds of hearsay and relevance, and also contends that the statements

25 constitute inadmissible character evidence.

26      Deputy Meza contends that Arteaga's testimony and statements describe her personal

27 observations of Mendez's conduct during an incident that prompted her to summon assistance

28 from the police.  He asserts that her observations are relevant to the question whether the

United States District Court

For the Northern District of California

1  Alameda County Sheriff's Deputies had legitimate law enforcement reasons to respond to the

2  scene, to have physical contact with Mendez, or to effectuate his arrest.

3         This objection is OVERRULED.  It is not hearsay, as Arteaga was simply asked to

4  confirm that the signed statement from October 5, 2002, was in fact signed by her at the

5  scene; to confirm that she was four months pregnant at the time; and to confirm that Mendez

6  came to her residence with a gun and that he threatened her father with the gun.  This is

7  testimony regarding Arteaga's observations of Mendez's conduct.  It is not "character

8  evidence."

9                g.     Mendez objects to the admission of the Arteaga statement given to the

10  Sheriff's Deputies on October 5, 2002, on grounds of hearsay, and also contends that the

11  statements constitute inadmissible character evidence.  In addition, Mendez claims that the

12  statements regarding what allegedly occurred in the "underlying domestic dispute" are not

13  relevant to the issues in Deputy Meza's summary judgment motion.

14         Deputy Meza's response is the same as for the Arteaga deposition testimony.

15         This objection is OVERRULED, as Mendez has not identified which portions of the

16  statement are objectionable.  Arteaga authenticated the statement in her deposition, in the

17  excerpt that is referenced above, and Mendez has not met his burden of proving that any

18  particular portion of the statement is inadmissible hearsay.  The statement is arguably not

19  relevant to the issues in Meza's summary judgment motion, but it is being offered as

20  background information.

21                h.     Mendez objects to the admission of three excerpts from the

22  deposition of his mother, Deborah Mendez, on grounds of hearsay and relevance, and also

23  contends that the statements contain inadmissible character evidence.  First, he objects to

24  admission of testimony regarding what Deborah Mendez knew about the circumstances

25  leading to Arteaga's decision to call the police on October 5, 2002.  Second, he objects to the

26  admission of testimony regarding whether Deborah Mendez or her son ever filed any

27  complaints with the Alameda County Sheriff's Office regarding the incident of October 5,

28  2002.  Third, he objects to the admission of testimony regarding whether Deborah Mendez

**United States District Court**
For the Northern District of California

1  knew Nancy Arteaga's parents, whether they had ever told her anything about an incident in

2  October 2002 when Mendez went to the Arteaga's residence with a handgun, or whether she

3  knew if Mendez owned a handgun.

4       Deputy Meza contends that these objections should be overruled.  With regard to the

5  first and third excerpts, he asserts that he has not even cited to those excerpts in the motion.

6  With regard to the second excerpt, he argues that the statements are admissible because Ms.

7  Mendez was testifying about facts of which she had personal knowledge.

8       This objection is OVERRULED.  The court has not relied on the first or third excerpts in

9  ruling on the motion.  With regard to the second excerpt, Deborah Mendez testified, based on

10  her personal knowledge, that she never filed any complaints about Meza's behavior, and that

11  to her knowledge, Mendez never filed any complaints.  These statements are not hearsay and

12  are not being offered as character evidence.

13                        **CONCLUSION**

14       In accordance with the foregoing, the court GRANTS defendant Derek Meza's motion

15  for summary judgment.

16

17  **IT IS SO ORDERED.**

18  Dated: November 22, 2005

19  _____

                    PHYLLIS J. HAMILTON

                    United States District Judge

20

21

22

23

24

25

26

27

28